Brad C. Stanford, OSB #854119
Kimberley Hanks McGair OSB#984205
bstanford@fwwlaw.com
kmcgair@fwwlaw.com
Farleigh Wada Witt
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

Attorneys for Plaintiff GROVER WICKERSHAM

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| GROVER WICKERSHAM, an individual, | Case No. |
| Plaintiff, | **PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY RELIEF** |
| v. | |
| EASTSIDE DISTILLING, INC., a Nevada corporation, DOES 1-30, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Grover Wickersham hereby submits his Complaint against Defendants

Eastside Distilling, Inc. and DOES 1-30 as follows:

## PARTIES

1.      Mr. Wickersham is a citizen and resident of California.

2.      Upon information and belief, Defendant Eastside Distilling, Inc. ("Eastside"), is, and was at all relevant times alleged herein, a corporation organized and exiting under the laws of the state of Nevada that maintains its principal place of business in Portland, Oregon.

3.      The true names and capacities of defendants sued as DOES 1 through 30 are

unknown to Mr. Wickersham and Mr. Wickersham prays leave to amend to allege the true names and capacities when they are ascertained.

4.      At all times relevant herein, each of the Defendants, including Eastside and DOES 1-30 (referred to collectively as "Defendants") was the authorized agent of each of the other remaining Defendants, and in engaging in the conduct alleged herein acted within the course and scope of such agency.

## JURISDICTION

5.      This action is brought, and subject matter jurisdiction lies within this Court pursuant to 28 U.S.C. §§ 1331 and 1332 as Mr. Wickersham claims, in part, arise under the laws of the United States and as there is complete diversity between Mr. Wickersham and Defendants, and the amount in controversy in this case exceeds $75,000 as it involves monetary damages caused by Eastside's unlawful conduct, including at least $185,000 in wrongfully denied compensation in addition other deprived benefits and damages.

6.      The Court has pendant/supplemental jurisdiction over any claims asserted herein which arise under state law in that such claims flow from a common nucleus operative fact.

7.      This Court has personal jurisdiction over Defendants due to the fact that Defendants are citizens of the state of Oregon and/or have sufficient minimum contacts with this jurisdiction related to the contracts, actions, and other subjects of this action and further as the claims alleged herein arise from Defendants transacting business within the state of Oregon and engaging in tortious conduct within the state of Oregon as more fully alleged below.

8.      Venue lies within this Court pursuant to 28 U.S.C. § 1391 in that all Defendants are subject to personal jurisdiction of the courts in the State of Oregon.

## GENERAL ALLEGATIONS

9.      Founded in 2008, Eastside is a producer and distributor of craft spirits, based in Portland, Oregon.  Eastside is a public company whose stock is traded on the Nasdaq Stock

Market.

10.     Mr. Wickersham first became aware of Eastside in or around late March or April of 2016.

11.     Since April of 2016, Mr. Wickersham has been the owner of shares of Eastside's stock and is also a trustee and a life beneficiary of a charitable remainder trust which owns shares of Eastside's stock, and the trustee of his daughter's irrevocable education trust, which also owns shares of Eastside's stock.

12.     Since that time, Mr. Wickersham increased his beneficial ownership of Eastside's stock to a total of 157,037 shares in July of 2019.

13.     On or around July 19, 2016, Mr. Wickersham was appointed to be a director of Eastside.  At the same time, Mr. Wickersham also became the Chairman of Eastside's Board of Directors.

14.     On November 22, 2016, Mr. Wickersham became Eastside's Chief Executive Officer following the resignation of Eastside's prior Chief Executive Officer, Mr. Stevan Earles.

15.     Mr. Wickersham served as Eastside's Chief Executive Officer from November 22, 2016 until May 10, 2019.

16.     During Mr. Wickersham's tenure as Chief Executive Office of Eastside, Eastside became the preeminent publicly-traded craft spirits company in the United States. When Mr. Wickersham became Chief Executive Office, Eastside was insolvent with less than $10,000 in its checking account, owed hundreds of thousands of dollars in delinquent taxes, had major accounting failures including a lengthy material deficiency letter from its auditors and a "going concern" audit opinion. Eastside was operating in risk of being shut down at any time by the Portland Fire Marshal under a cease and desist order for operating in an unheated facility in violation of the fire code. Eastside's stock was a penny stock traded on the "bulletin board" market and had declined in value by over 95% during the preceding month from $0.80 per share

to $0.04 per share.

17.    Mr. Wickersham is an experienced and successful professional who holds a juris doctor degree from the University of California (Hastings) and a master's degree in business administration from Harvard. Because investors were attracted to Mr. Wickersham's leadership and strategic vision, Eastside was successfully funded after Mr. Wickersham took over as Chief Executive Officer. Following Mr. Wickersham's strategic direction, Eastside rebranded its product portfolio in teamwork with Sandstrom Partners, massively expanded its production capacity through the acquisition of Motherlode and Craft Canning + Bottling, increased sales of its vodka product tenfold, created the acclaimed Burnside family of bourbon and rye spirits finished in Oregon oak, launched the highly successful Redneck Riviera Whiskey nationally, and expanded into the high-growth "ready-to-drink" product market.

18.    Under Mr. Wickersham's leadership, Eastside's working capital increased to $18 million and its revenues increased from a total of $3.1 million for the entire 2016 year to $3.7 million in just the first quarter of 2019.  Eastside was also up listed to the full NASDAQ market. Indicative of Mr. Wickersham's successful strategic direction, Eastside's share price increased dramatically from the post uplisting price of $3.25 to a high of $9.25 per share resulting in tens of millions of dollars begin invested in Eastside's rising stock.

19.    During Mr. Wickersham's tenure as Eastside's Chief Executive Officer, Eastside's Compensation Committee headed by Trent Davis agreed to grant 10,000 Restricted Stock Units ("RSUs") each to Mr. Wickersham and CFO Steve Shum. These securities had a value of $60,000 (each) at their time of planned issuance of Mr. Shum and Mr. Wickersham in 2019. Although $60,000 of RSUs were issued as agreed to Mr. Shum, Mr. Davis and Eastside wrongfully and willfully withheld issuance of these RSUs to Mr. Wickersham.  Eastside has wrongfully refused to issue the RSU's (that have now declined over 80% in value) despite Mr. Wickersham's repeated requests for this property that is rightfully his.

20.    Following Mr. Wickersham's completion of a major acquisition and a $8 million capital raise, and despite Mr. Wickersham's many accomplishments and achievements during his tenure as Eastside's Chief Executive Officer, a coterie of directors collaborated to remove Mr. Wickersham as Eastside's Chief Executive Officer without disclosing their highly material intentions to investors in securities offering documents (including in Eastside's 2018 Form 10-K or its Form 10-Q for the Quarter ended March 31, 2019).

21.    Mr. Wickersham became aware in or around April 8, 2019, almost immediately following the filing of Eastside's 2018 Form 10-K, that Eastside's board of directors was mandating either Mr. Wickersham's resignation or severance as Eastside's Chief Executive Officer.

22.    Mr. Wickersham believes that the decision to force his resignation or severance as Eastside's Chief Executive Officer was due to objections and issues he raised as to certain decisions, actions, and other conduct of Eastside and its Board of Directors, including pressing governance issues related to Eastside's and its employees' relationships with third parties in violation of Eastside's Employee Code of Conduct, conflict issues involving Eastside's directors, as well as Eastside's insufficient financial condition for a proposed substantial acquisition of Azunia Tequila.  Mr. Wickersham had an acquisition strategy (acquiring profitable businesses and products) to address what he saw as the need for Eastside to reach profitability in 2019, while sustaining the high level of expenses mandated by Mr. Trent Davis and the board over his objection. Rather than addressing the objections and issues raised by Mr. Wickersham, the other members of Eastside's board of directors joined forces to remove Mr. Wickersham from his position as Eastside's Chief Executive Officer. As the subsequent history has shown, Eastside's efforts to turn away from Mr. Wickersham's successful strategy (that had produced such great increases in all business metrics and a rise in stock price) produced the opposite results, reversing

the gains.

23.    As part of Eastside's mandated resignation of Mr. Wickersham, Eastside proposed an agreement that would include Mr. Wickersham's agreement to resign as Chief Executive Officer, a release of various claims against Eastside, a non-disparagement agreement, as well as an agreement to serve as Eastside's Executive Chairperson.

24.    As part of Eastside's mandated resignation of Mr. Wickersham, Mr. Wickersham was forced to enter into the agreement proposed by Eastside which was signed in two parts (the "Executive Chairperson Agreement" and the "Release of Claims" and referred to collectively as the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A and is hereby incorporated as if fully stated herein.

25.    The Agreement included non-equivalent mutual releases of claims, a non-disparagement provision, as well as an agreement that Mr. Wickersham would assume the position of "Executive Chairperson" which had various duties for Mr. Wickersham to perform for Eastside, including duties with the Board of Directors, serving as the Chair of the Acquisition Committee, continuing participation in Product Development and Marketing, including cannabidiol-related products, as well as assisting Eastside with financings.

26.    In connection with Mr. Wickersham's promised position as "Executive Chairperson", Eastside promised that Mr. Wickersham would receive annual compensation of $185,000 payable in monthly installments and reimbursement for health insurance as well as the potential to receive equity grants and a discretionary bonus.  There was no express termination date in the Agreement.  Mr. Wickersham's compensation under the Agreement was guaranteed through the first anniversary of Eastside's annual meeting on August 8, 2019 "assuming [Mr. Wickersham was] elected by the shareholders to the Board of [Eastside]".

27.    The Agreement was signed on or around May 10, 2019 with Mr. Wickersham to commence his role as Executive Chairperson under the Agreement on May 13, 2019.  Once the

Agreement was entered into, Mr. Wickersham understood that his relationship with Eastside was to continue for the foreseeable future in his role as Executive Chairman and serving on the Board of Directors. Mr. Wickersham diligently sought out to fulfill his duties as Executive Chairperson.

28.    Eastside publicly announced and promoted Mr. Wickersham's "transition to Executive Chairman, stepping down from his dual role as Chairman and Chief Executive Officer" in a press release on May 13, 2019 that was reviewed and cleared by Eastside's counsel and its then CEO, Steve Shum.

29.    While it ostensibly appeared to investors that Eastside was seeking to move forward with Mr. Wickersham in a role as chief strategist, the Agreement was merely a ruse to get Mr. Wickersham to agree to a release of claims without having to pay the agreed compensation for same. Eastside and its Board of Directors had no intention of honoring Eastside's promises to Mr. Wickersham even when the Agreement was formed. In a plan orchestrated by some of Eastside's directors and Eastside's outside counsel, Christopher Hall, the goal was to remove Mr. Wickersham from the Board of Directors entirely, while relying on the fraudulently obtained releases to avoid the inconveniences of potential claims that could be brought by Mr. Wickersham, including whistleblower claims, breach of fiduciary claims and claims for wrongful termination.

30.    On June 11, 2019, Eastside's Board of Directors held its first meeting after the Agreement was signed. This short meeting was not attended in full by Christopher Hall, David Holmes or certain other directors. Mr. Wickersham voiced his concerns over observed violations of the Eastside Code of Conduct (that he had previously been raised in writing). An experienced former SEC lawyer, Mr. Wickersham raised the fact that Trent Davis did not meet the legal requirements for being considered "independent" (meaning any actions he had taken as an "independent" director would be illegitimate), because of his familial relations employed at the

company exceeding the allowable compensation. Although the issue of director independence was never actually voted upon and determined by Eastside's Board of Directors, Christopher Hall prepared and filed a proxy statement on Eastside's behalf that implied that it had voted and identified Trent Davis as an independent director.

31.     Mr. Wickersham called for immediate and specific actions to deal with a major cash shortfall disclosed by Eastside's CFO for the first time at the meeting. Mr. Wickersham also raised cash flow concerns about the proposed Azunia merger and demanded that he be given additional time to present conclusions and analysis that pointed to the best course being to delay the merger until after Mr. Wickersham and Eastside had increased positive cash flow by way of other proposed cash flow accretive mergers.

32.     Mr. Wickersham also objected to the structuring of the transaction by Mr. Hall to circumvent NASDAQ rules requiring highly material transactions be approved by a vote of shareholders, something that Mr. Wickersham believed could not be obtained. Subsequent events and the resulting destruction in shareholder value in excess of $50 million have proven that Mr. Wickersham's predictions were accurate. Mr. Wickersham is informed and believes that as of the date of the filing of this Complaint: (1) the consideration to be paid under the Azunia acquisition contract exceeds the entire market capitalization of Eastside and (2) the transaction has never been submitted to shareholder vote.

33.     On June 15, 2019, the Saturday of Father's Day weekend, Mr. Wickersham first learned that a contingent of Eastside's board of directors proposed the removal Mr. Wickersham from the slate of directors eligible for election at the next shareholder meeting.

34.     When a shocked and surprised Mr. Wickersham objected on the basis that there was no urgency to complete the slate and asked for time to respond, he was met with Trent Davis' objection, that it would only "give (Mr. Wickersham) more time to organize legal opposition."

35.    On June 20, 2019, only thirty-eight days after Mr. Wickersham assumed the position of Executive Chairperson and a mere nine days after the single Board meeting with Mr. Wickersham serving as Executive Chairperson, a bare majority of four members the Board of Directors voted to exclude Mr. Wickersham from the slate of directors who were eligible for election at the next shareholder meeting.

36.    This proposal was recommended by a two-person Corporate Governance Committee consisting of Trent Davis (who Mr. Wickersham asserts was not independent) and Mick Fleming, a third director who was an ally of Mr. Wickersham having resigned without being given the opportunity to participate. Mr. Wickersham is informed and believes and thereon alleges that Defendants orchestrated this vote to, in part, deprive Mr. Wickersham of his bargained-for benefits under the Agreement as well as vested and unvested stock compensation.

37.    Due to the timing of the Annual Meeting of Shareholders and Eastside's bylaws, the vote was calculated to and had the effect of precluding Mr. Wickersham and his many supporters amongst the public shareholders from exercising their democratic rights to nominate him for the slate and remain on the Board of Directors after August 8, 2019. Despite (or, perhaps, because of) his support amongst the shareholders, the board precluded Mr. Wickersham from continuing as a director of Eastside, a deception that raised shareholder ire and led to Trent Davis and two of the directors being effectively voted off the board by shareholder vote and a fourth resigning after being informed he would probably have insufficient votes.

38.    Following his removal from the slate of directors for election, Eastside asserted that Mr. Wickersham's continued compensation and benefits under the Agreement were conditioned on his being "elected by the shareholders to the Board of [Eastside]".  Based on Eastside's position, the June 20, 2019 vote by Eastside's Board of Directors used a base deception to unilaterally deprive Mr. Wickersham of the opportunity to receive the benefits he

was promised through the Agreement signed only weeks earlier.

39.     Mr. Wickersham had the support of many, if not probably most, third-party shareholders to continue with Eastside based on his prior success leading the company, including continuing to serve in his role as a Director of Eastside.  This third-party support was known and disclosed to the Board of Directors in writing by multiple shareholders, some of whom were outraged. The stock analyst who first covered Eastside even published a note questioning the removal of Mr. Wickersham from the slate. Just as the board—whose "independent" members owned little or no stock purchased with their own money — was oblivious to the drop in Eastside's stock price when Mr. Wickersham left the CEO position for the Executive Chairman position, the board ignored the fact that it's cynical and calculated action in jettisoning Mr. Wickersham from the slate resulted in a further decline in the stock price.

40.     Despite having actual knowledge of the support for Mr. Wickersham continuing as a Director of Eastside, the Board of Directors refused to allow Mr. Wickersham to be eligible for election by the shareholders.

41.     Mr. Wickersham specifically requested that Eastside, through its Board of Directors, vote to allow Mr. Wickersham to be eligible for election at the Annual Meeting or postpone the Annual Meeting to allow Mr. Wickersham to give notice to be eligible for election as a director.  Defendants refused Mr. Wickersham's reasonable request.

42.     In the end, the Board's decision to remove Mr. Wickersham from the list of candidates for election as Director effectively denied Eastside's stockholders the opportunity to vote for the candidate of their choosing.

43.     Prior to Eastside's 2019 annual meeting of shareholders, Eastside released its Definitive Proxy Statement on July 11, 2109.  In the Definitive Proxy Statement, Eastside stated in writing twice that:

> Mr. Wickersham is paid an annual fee of $185,000 and is eligible
> for certain discretionary bonuses and equity awards. In addition,

Page 10 -   PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY
            RELIEF; DEMAND FOR JURY TRIAL

Mr. Wickersham is reimbursed for out of pocket healthcare insurance at the same rate that he was paying immediately prior to the Executive Chairperson Agreement. These payments will continue until the 2020 annual meeting of stockholders <u>irrespective</u> (emphasis supplied) of whether Mr. Wickersham continues to serve as Executive Chair.

44.    Eastside's 2019 annual meeting of shareholders went forward on August 8, 2019 (the "2019 Annual Meeting").  As a consequence of their shocking breach of contract and abuse of corporate governance, and even absent a proxy fight, the public shareholders responded to the board's actions by refusing to reelect the lead independent director Trent Davis and all three other independent directors.  Prior to the commencement of the 2019 Annual Meeting, the preliminary tally of votes showed that the four ostensibly independent directors, including Trent Davis, David Holmes, Michael Fleming, and Matthew Szot (collectively, the "Former Directors") would not receive sufficient votes to be reelected as Directors of Eastside.  After becoming aware of the preliminary tally of votes, each of the Former Directors verbally announced their resignation as a Director of Eastside without providing any basis for the resignation.  David Holmes even stormed out in a huff past the shareholders waiting for the meeting, some of whom were ready to vote against him and secure his defeat.

45.    Eastside's July 11, 2109 Definitive Proxy Statement released before the 2019 Annual Meeting confirmed in writing that each of the Former Directors intended to remain on the Board of Directors of the Company, if elected.  Given these prior written statements approved by the Former Directors, and the timing of the resignations only after the preliminary tally of votes, Mr. Wickersham is informed and believes and thereon alleges that the Former Directors' resignations were precipitated by the anticipated official voting results being insufficient for their reelection, not other factors.

46.    Following the 2019 Annual Meeting, a Form 8-K (the "Form 8-K") was filed on Eastside's behalf on August 9, 2019.  Incredulously, Mr. Wickersham is informed and believes and thereon alleges that some content for this Form 8-K came from Mr. Holmes and/or Mr.

Davis even though each was no longer a Director of Eastside.  Furthermore, Mr. Wickersham is informed and believes and thereon alleges that the Form 8-K was never shown to or approved by the Eastside's then-existing Board of Directors, despite falling within the scope of filings typically reviewed and approved by the Eastside's Board of Directors.  The Form 8-K included unnecessary and inaccurate comments which perpetuated a mischaracterization of the Former Directors' "resignations."  As alleged above, the Former Directors' resignations were not the result of some dispute with Eastside or any stockholders or other persons affiliated with Eastside, but to avoid losing their bids for re-election as Directors of Eastside.

47.     The Form 8-K as filed falsely stated that the Former Directors "indicated that their resignations related to an unwillingness to continue to serve under circumstances where they believed that continuing to serve would be constrained by other non-management individuals associated with Eastside."

48.     Alternatively, Mr. Wickersham is informed and believes, and thereon alleges that Mr. Davis and/or Mr. Holmes falsely communicated to Eastside or its agents that Mr. Wickersham had somehow caused each to have an unwillingness to serve on Eastside's board of directors which falsehood Eastside recklessly republished publicly through the filing of the Form 8-K.

49.     As alleged above, when the Former Directors resigned, they did so verbally and without any indication for their resignations as it was readily apparent given the prior written statements and timing of the resignations that the resignations were simply to avoid a failure to be re-elected.  However, the Form 8-K mistakenly led third parties to believe that Mr. Wickersham somehow interfered with the Former Directors' ability to serve or caused their resignations, thus unlawfully defaming Mr. Wickersham and disparaging him in violation of the Agreement.

50.     Additionally, Mr. Wickersham has had multiple conversations and/or inquiries

regarding his past and current relationship with Eastside, Eastside's 2019 Annual Meeting, and the August 9th Form 8-K which evidence wrongful disclosures and statements by persons who have legal and contractual duties to refrain from such disclosures and statements.

51.     The unapproved Form 8-K filed on August 9, 2019 and its gratuitous content led to the commencement of an investigation of the Eastside and Mr. Wickersham by NASDAQ. This investigation required Mr. Wickersham to retain legal counsel. In addition, Christopher Hall urged Eastside to investigate purported proxy violations by Mr. Wickersham for which Mr. Hall offered no factual basis. Mr. Wickersham was completely vindicated, but was made to retain counsel at his expense, in excess of $50,000.

52.     Following the 2019 Annual Meeting, Mr. Wickersham ceased serving as a Director of Eastside due to Defendants' unilateral exclusion of Mr. Wickersham from the slate of persons eligible to be elected as directors.

53.     Following the 2019 Annual Meeting, Mr. Wickersham was asked by Eastside to continue advising Eastside in exchange for continuing to receive the benefits promised in the Agreement.  Mr. Wickersham did continue advising Eastside for a period of time, until Eastside refused to honor the promises made in the Agreement and also stated in Eastside's Definitive Proxy Statement.

54.     Despite the promises made in the Agreement and the statements made in the Definitive Proxy Statements, Eastside has refused to honor the promises made to Mr. Wickersham in the Agreement, including without limitation refusing to pay Mr. Wickersham's promised board fee and health insurance reimbursement, or deliver Mr. Wickersham's Restricted Stock Units that continue to be held and controlled by Eastside. Mr. Wickersham has substantial options and RSUs that were valued at more than a million dollars in Eastside's public disclosure that were terminated wrongfully by Eastside.

55.     Furthermore, at Christopher Hall's direction and despite the end of Mr.

Wickersham's tenure as a director of Eastside, Eastside has persistently and wrongfully refused to remove restrictive legends arising from his affiliate status from stock held by (1) Mr. Wickersham, (2) the charitable remainder trust for which Mr. Wickersham serves as co-trustee and a life beneficiary, and (3) Mr. Wickersham's daughter's irrevocable trust, for which he serves as trustee.  Eastside's refusal to remove the restrictive legends has harmed Mr. Wickersham and the trusts over which he serves as trustee in an amount to be proved at trial, but believed to be at least $300,000.

### FIRST CLAIM FOR RELIEF
### Fraud in the Inducement
### (Mr. Wickersham against Defendants)

56.    Mr. Wickersham re-alleges the allegations in paragraphs 1 through 55, inclusive, as though fully set forth herein.

57.    Defendants represented to Mr. Wickersham that it would provide Mr. Wickersham with the payments and benefits identified above, including in the Agreement.

58.    Defendants' representations to Mr. Wickersham were false in that Defendants did not intent to pay the agreed-upon amounts or provide any of the benefits described in the Agreement as evidenced by Defendants' swift action to preclude Mr. Wickersham from receiving the benefits promised in the Agreement by precluding Mr. Wickersham's opportunity to have Eastside's shareholders determine if Mr. Wickersham should be elected as a Director and using resulting automatic failure to be elected as a director to deprive Mr. Wickersham of his right to receive the benefits to which he was entitled under the Agreement. Defendants' lack of intent to pay the agreed-upon amounts or provide any of the benefits described in the Agreement is evident from their actions which occurred only weeks after their representations to Mr. Wickersham and adopting the Agreement which expressly provided for more than one year of payments and benefits to Mr. Wickersham.

59.    Defendants' lack of intent to pay the agreed-upon amounts or provide all the

benefits described in the Agreement was confirmed in their failure to do so.

60.    Defendants' representations were made with the intent to deceive Mr. Wickersham into providing a release of claims to Defendants and providing his services under the Agreement.

61.    Defendants' representations were made with the intent that Mr. Wickersham would rely on the representations by signing the Agreement and granting a release of claims in anticipation of the benefits promised in the Agreement.

62.    Mr. Wickersham had no reason not to rely on Defendants' representations. Rather, Mr. Wickersham reasonably relied on Defendants' representations by signing the Agreement and granting Defendants a release of claims.

63.    As a direct and proximate result of Defendants' fraud and misrepresentations, Mr. Wickersham has been harmed substantially in amounts to be determined at trial, but exceeding $250,000. In the alternative, Mr. Wickersham requests rescission of the Agreement together with equitable compensation to him to fairly compensate him for the economic and noneconomic damages he has incurred and the expenditure he has made in connection with the Agreement, along with his lost income incurred by believing he owed obligations to Defendants under the Agreement and lost income resulting from Defendants' delay in removing the restrictions on stock held by (1) Mr. Wickersham, (2) the charitable remainder trust for which Mr. Wickersham serves as co-trustee and a life beneficiary, and (3) Mr. Wickersham's daughter's irrevocable trust, for which he serves as trustee.

64.    Defendants' conduct was intentionally deceptive, wanton and willful, and Mr. Wickersham is entitled to an award of punitive damages in an amount to be determined at trial.

///

///

///

///

## SECOND CLAIM FOR RELIEF

### Breach of Contract

#### (Mr. Wickersham against Defendants)

65.     Plaintiff re-alleges the allegations in paragraphs 1 through 64, inclusive, as though fully set forth herein.

66.     On or around May 10, 2019, Plaintiff and Eastside entered into the Agreement, a valid and enforceable written contract.

67.     Plaintiff has at all times relevant performed all or substantially all of the significant things that the Agreement required him to do, except to the extent he was prevented from performing by the actions of Eastside but yet remained ready, willing, and able to perform all or substantially all of the significant things that the Agreement required him to do.

68.     Eastside breached the Agreement in various ways, including without limitation: preventing Plaintiff from performing his duties under the Agreement, refusing to include Plaintiff in the potential directors eligible for election at the 2019 Annual Meeting, refusing to postpone the 2019 Annual Meeting to allow Mr. Wickersham to nominate himself for election as a director of Eastside, disparaging Mr. Wickersham in the unnecessary content filed in the Form 8-K, and by refusing to compensate Mr. Wickersham as promised in the Agreement, including without limitation the board fee and health insurance reimbursement owed to Plaintiff.

69.     As a direct and proximate result of Eastside's breach of the Agreement, Plaintiff has been harmed substantially in amounts to be determined at trial, but exceeding $250,000.

## THIRD CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

#### (Mr. Wickersham against Defendants)

70.     Counter-Claimant re-alleges the allegations in paragraphs 1 through 69, inclusive,

as though fully set forth herein.

71.    On or around May 10, 2019, Mr. Wickersham and Eastside entered into the Agreement, a valid and enforceable written contract.

72.    The Agreement has a choice of law provision which states that the Agreement is to be "governed by and construed in accordance with the laws of the State of Nevada." Every contract in Nevada imposes upon the contracting parties a duty of good faith and fair dealing which requires the parties to perform in accordance with the intention and spirit of the contract.

73.    Mr. Wickersham has at all times relevant performed all or substantially all of the significant things that the Agreement required him to do, except to the extent he was prevented from performing by the actions of Eastside but yet remained ready, willing, and able to perform all or substantially all of the significant things that the Agreement required him to do.

74.    In the event Defendants are found to have complied with the terms of the Agreement, then in the alternative, Defendants deliberately contravened the intention and spirit of the Agreement by precluding Mr. Wickersham's opportunity to have Eastside's shareholders determine if Mr. Wickersham should be elected as a Director and using resulting automatic failure to be elected as a director to deprive Mr. Wickersham of his right to receive the benefits to which he was entitled under the Agreement. Defendants' actions were done knowingly and intentionally in contradiction to the intention and spirit of the Agreement which had been approved and adopted by Defendants only weeks before Defendants' wrongful actions commenced.

75.    Defendants have therefore materially breached their duties of good faith and fair dealing arising out of the Agreement.

76.    As a direct and proximate result of Defendants' breach of their duties of good faith and fair dealing arising out of the Agreement, Mr. Wickersham has been harmed substantially in amounts to be determined at trial, but exceeding $250,000.

Page 17 -   PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY
            RELIEF; DEMAND FOR JURY TRIAL

///
///

## FOURTH CLAIM FOR RELIEF

### Defamation

### (Mr. Wickersham against Defendants)

77.    Mr. Wickersham re-alleges the allegations in paragraphs 1 through 76, inclusive, as though fully set forth herein.

78.    Upon information and belief, on or about August 8-9, 2019, Defendants published written materials in e-mail messages and the Form 8-K making statements to the effect that Mr. Wickersham was the cause of the resignation of Eastside's Former Directors.

79.    The publications were made of and concerning Mr. Wickersham and was so understood by those who read the publications.

80.    All of the statements in the written material were and are false as they pertain to Mr. Wickersham.

81.    These published statements were and are defamatory and libelous on their face and diminish Mr. Wickersham's esteem, respect, goodwill, and confidence in which he is held in the community.

82.    Because the statement injured Mr. Wickersham in his business or profession, Defendants' statements are defamatory per se and give rise to a presumption of damages.

83.    The statements have caused Mr. Wickersham damage and presumed damage to his reputation in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Interference with Economic Advantage

### (Mr. Wickersham against Defendants)

84.    Mr. Wickersham re-alleges the allegations in paragraphs 1 through 83, inclusive, as though fully set forth herein.

85.     Defendants have intentionally and tortiously interfered with the prospective economic advantage of Mr. Wickersham by refusing to deliver the Restricted Stock Units granted to Mr. Wickersham, by, inter alia, wrongfully terminating Mr. Wickersham's substantial options and RSUs that were valued at more than a million dollars in Eastside's public disclosure, and persistently and wrongfully refusing to remove restrictive legends arising from his affiliate status from stock held by (1) Mr. Wickersham, (2) the charitable remainder trust for which Mr. Wickersham serves as co-trustee and a life beneficiary, and (3) Mr. Wickersham's daughter's irrevocable trust, for which he serves as trustee.

86.     As a direct and proximate result of Defendants' wrongful actions, Mr. Wickersham has suffered and will continue to suffer damages in an amount in excess of $300,000 to be determined at trial. Defendants' actions are a substantial factor in causing this harm.

## SIXTH CLAIM FOR RELIEF

### Elder Financial Abuse

**(Mr. Wickersham against Defendants)**

87.     Mr. Wickersham re-alleges the allegations in paragraphs 1 through 86, inclusive, as though fully set forth herein.

88.     At all times material, Mr. Wickersham was an "elderly person," and a "vulnerable person" as defined in ORS 124.100.

89.     Through its actions, Eastside wrongfully appropriated from Mr. Wickersham money, shares, and property belonging to Mr. Wickersham.

90.     Through its actions, Eastside acquired control of Mr. Wickersham's money and property and, without good cause, continued to hold and failed to take reasonable steps to make Mr. Wickersham's money and property readily available that was held or controlled by Eastside after Mr. Wickersham requested that his money and property be transferred by Eastside to Mr. Wickersham, which actions and omissions were done by Eastside in bad faith and while Eastside

knew or should have known of Mr. Wickersham's right to have the money or property transferred as requested or otherwise made available to Mr. Wickersham.

91.    Mr. Wickersham has suffered economic damages in an amount to be proven at trial, but estimated to exceed $800,000.

92.    Mr. Wickersham has also suffered non-economic damages, which are not fully liquidated and will be pled more specifically reasonably prior to trial, for Mr. Wickersham's non-monetary losses including, but not limited to, pain, mental suffering, emotional distress, reputational harm, humiliation, anxiety, apprehension, inconvenience and interference with normal and usual activities in an amount to be proven at trial, but estimated to exceed $350,000.

93.    Eastside's conduct constituted elder financial abuse under ORS 124.110(1)(a), entitling Mr. Wickersham to an award of three times all economic damages and noneconomic damages, collectively estimated to exceed $3,450,000, and the reasonable attorney's fees and costs incurred by Mr. Wickersham.

## SEVENTH CLAIM FOR RELIEF

## Dissemination of False and Misleading Proxy Materials

## in Violation of 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a–9

### (Mr. Wickersham against Defendants)

94.    Mr. Wickersham re-alleges the allegations in paragraphs 1 through 93, inclusive, as though fully set forth herein.

95.    During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

96.    The Proxy contained material misrepresentations and omissions and was an essential link in the accomplishment of removing Mr. Wickersham from the Board of Directors and improperly terminating the executive chairperson agreement the Acquisition, and was

prepared, reviewed and/or disseminated by defendants. It misrepresented and/or omitted material facts, including that the company intended to continue paying Mr. Wickersham and using him as an advisor even if not elected as a director.

97.    In so doing, defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, defendants were aware of this information and of their duty to disclose this information in the Proxy.

98.    Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

99.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the matters presented for shareholder vote at the 2019 annual meeting, including the election of directors. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

100.    By reason of the foregoing, defendants have violated 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a–9 promulgated thereunder.

101.    Because of the false and misleading statements in the Proxy, Mr. Wickersham was injured.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Wickersham prays for:

1.    Entry of judgment in his favor on each claim raised herein;

2.    Relief as set forth in each cause of action above;

Page 21 -   PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY
           RELIEF; DEMAND FOR JURY TRIAL

3.      General, compensatory, and consequential damages in an amount to be proven at

trial;

4.      Under ORS 124.100(2)(a), triple Mr. Wickersham's economic damages, to be

proven at trial, estimated to be in excess of $2,400,000;

5.      Under ORS 124.100(2)(b), triple Mr. Wickersham's noneconomic damages, to be

proven at trial, estimated to be in excess of $1,050,000;

6.      Attorney's fees and costs of suit, including without limitation under ORS

124.100(2)(c);

7.      Pre- and post-judgment interest;

8.      Such other relief as the Court deems just and proper.


DATED this 15th day of December, 2020.

FARLEIGH WADA WITT


By:  _/s/ Brad C. Stanford_____
       Brad C. Stanford, OSB #854119
       Kimberley Hanks McGair OSB#984205
       (503) 228-6044
       bstanford@fwwlaw.com
       kmcgair@fwwlaw.com
       Attorneys for Plaintiff